UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CORBIN BERNSEN,                         :
                                        :
            Plaintiff,                  :
                                        :
v.                                      : ACTION NO. 2:11CV546
                                        :
INNOVATIVE LEGAL MARKETING, LLC         :
                                        :
            Defendant.                  :

## REPORT AND RECOMMENDATION

Innovative Legal Marketing, LLC ("ILM") and actor, Corbin Bernsen, ("Bernsen") each claim the other breached the terms of a written spokesperson agreement ("the Agreement"). Before the Court is ILM's Motion for Summary Judgment which argues the contract language is clear, and Bernsen's undisputed conduct violates the terms of the Agreement's morality clause. Bernsen opposed the motion, ILM replied (ECF Nos. 24, 25), and pursuant to 28 U.S.C. §636(b)(1)(B), the matter was referred to the undersigned for a Report and Recommendation.

After considering the briefs, exhibits, and oral argument, the undersigned finds no ambiguity in the contract language necessary to resolve the pending motions, however, disputes of fact preclude summary judgment on the alleged breach of the morality clause. Accordingly, for the reasons set forth in

1

detail below, the undersigned recommends the Court GRANT in part and DENY in part ILM'S motion.

## A.   RECOMMENDED FINDINGS OF UNDISPUTED MATERIAL FACT

ILM is a Virginia corporation managed by Brien Johnson ("Johnson") which provides marketing services for lawyers and law firms through advertising campaigns.  ILM created the BIG CASE marketing campaign which included Bernsen as its spokesperson.  Bernsen is an actor best known for his role as Arnie Becker on the television show, L.A. Law.  (ECF No. 24-1 at 2).

On October 8, 2009, Corbin Bernsen entered into a spokesperson agreement with ILM.  (ECF No. 19-3).  The morality clause appears in one of two provisions of the Agreement headed "Indemnification" which states in relevant part:

> VI.  INDEMNIFICATION.  Network will name Talent on its general liability insurance policy.  Talent agrees to not commit any act or do anything which may tend to bring Talent into public disrepute, contempt, scandal or ridicule or which might tend to reflect unfavorably on the Network, their clients or on the Talent.

(ECF No. 19-3 at 4).  The Agreement also contains terms related to termination:

> XV.  TERMINATION.
> A.  Talent agrees that Network may terminate this Agreement and Talent's Services upon the occurrence and during the continuance of any of the following contingencies:

    i. Upon the occurrence of a Default or breach, or at any time during the continuance thereof, effective as of the date of the occurrence of the Default. Talent acknowledges and agrees that Talent shall have five (5) days following receipt of notice of default in which to cure such Default and/or breach and notify Network in writing that the Default and/or breach has been cured; provided that such Default or breach is by reason of any inadvertent failure or neglect to perform and is capable of immediate cure. Further, Talent agrees to be fully and completely liable for any and all expenses or costs incurred by Network in connection with such Default.

...

B. Effect of termination, if Network terminates this Agreement in accordance with the provisions of this Paragraph, Network shall be released and discharged from any liability or obligation whatsoever to Talent hereunder. The representations and warranties and indemnification obligations of Talent hereunder shall survive any termination of this Agreement, and neither Network's ownership of the Picture nor any grant of rights to Network hereunder shall be affected, limited or terminated in any way by any termination or cancellation of this Agreement for any reason.

...

XVII. REMEDIES. No breach of Network's obligations or its clients, licensees or assignees under this Agreement shall entitle Talent to equitable remedies. Talent agrees that Talent's rights are limited to the right, if any, to obtain damages in action at law….

(ECF No. 19-3 at 6).

    The Agreement required Bernsen to be available for at least thirty full days each year to record promotional announcements, make promotional appearances, and for still photography

sessions.  Id. at 2.  In exchange, ILM agreed to pay Bernsen $200,000 each year of the five-year Agreement.  Id. at 4. Bernsen performed as required, and several ILM clients began using the BIG CASE campaign. Likewise, ILM began making payments under the Agreement.

In June 2011, Bernsen had a telephone conversation and email exchanges with Johnson in which Johnson explained that ILM was terminating the Agreement.  (ECF No. 24-1 at 3).  ILM subsequently ceased making any payments to Bernsen.  Id.  When Bernsen requested a payment, ILM refused and asserted that Bernsen had violated the "morals clause" in the Agreement, giving it the right to discontinue future payments.  The alleged breach of the morality clause relied upon by ILM involves five separate incidents.

Approximately three months prior to signing the Agreement, around July 2009, Bernsen acted in a comedy skit for the television show "Tim and Eric Awesome Show, Good Job!" (ECF No. 24-1 at 4).  The fifty-second clip featured a grotesque spoof on plaintiff's attorneys, in which Bernsen professes to be an "amateur attorney" who will procure $25 cash settlements for victims of "diarrheabedis."  The skit aired on February 28, 2010, after Bernsen had signed the Agreement.  (ECF No. 19-1 at 2).

4

In May 2010, internet media reported that Bernsen had a $94,681 California tax lien filed against him. (ECF Nos. 19-5, 19-6). The same article reported such liens against other actors, Dawn Wells, Jeff Bridges, and Billy Zane. (ECF No. 19-6).

On June 18, 2010, Bernsen was interviewed for a television segment titled "Celebrity Ghost Stories" in which he openly discussed his prior drug use and promiscuity as a teenager in the 1960s and '70s. (ECF No. 19-2 at 9). In the segment, Bernsen explained that his life had gotten out of control, that it scared him. He described encountering the "ghost" of his deceased aunt which ultimately motivated him to turn to a more proper course. (ECF No. 19-4).

In July 2010, Bernsen was involved in an altercation at a bar in Ohio. (ECF No. 19-2 at 8). In his deposition Bernsen explained that he and another member of his crew were defending a female crew member from the unwanted advances of a bar patron. (ECF No. 31-3 at 9-11). The patron struck Bernsen's crew member in the eye, and as he fled, Bernsen threw a handful of gravel at the assailant's car. Id. The driver got out of his car, pushed Bernsen to the ground, and caused him to injure his knee. (ECF Nos. 19-2 at 7-8; ECF No. 31-3 at 9-11). The incident was reported by several national media outlets, in which the

5

headline described Bernsen as involved in a "bar brawl." (ECF Nos. 19-8, 19-9, 19-10). Bernsen was also quoted as saying "If one of the guys had a gun, you'd be dead. If I had a gun, you'd be dead." (ECF No. 18-8).

Finally, in January 2011, Bernsen attended a conference hosted by an ILM client in Cap Cana. According to his deposition, Bernsen arrived at the airport in Cap Cana and tried for 45 minutes to reach someone to meet him and his family. (ECF No. 31-3 at 15). Bernsen was told then that his family was unable to stay at the adults-only hotel where the conference was held because his son was too young. Id. Instead, Bernsen and his family were required to stay at another hotel that was forty minutes away. Id. Later, after confirming by phone that his son would be able to attend a specific event at the hotel, Bernsen, his wife, and son arrived at the event only to be told that his son was not allowed. Id. Bernsen became angry and loud, and he criticized the organization of the conference to Mr. Dinzler, Johnson's associate. (ECF Nos. 24-1 at 4; 31-1 at 16). Approximately six other individuals, including the conference host, an ILM client, were in the vicinity at the time. (ECF Nos. 19-2 at 9; 31-3 at 16).

The June 16, 2011 email from Johnson terminating ILM's relationship with Bernsen as the national spokesperson did not

6

cite the morality clause or specifically enumerate any alleged breach by Bernsen.  (ECF No. 19-13).  Johnson did write in the email, however, that "I did receive negative calls and emails from licensees and conference attendees regarding the bar fight in Ohio that made national wires and the Celebrity Ghost Stories segment where Corbin openly discussed his prior drug use history.  I believe this affected our credibility with potential licencees." Id.[1]

ILM asserts that the termination was justified based on a material breach of the Agreement's morality clause.  (ECF No. 19 at 1).  The company also moves for summary judgment on Bernsen's equitable claim of unjust enrichment, arguing the terms of the Agreement exclusively govern his right to recover.  Bernsen contends that the alleged "morality clause" violations are merely pretext for his termination, which was actually motivated by the generally poor financial performance of the BIG CASE marketing scheme.  (ECF No. 24 at 6).  Bernsen also argues that the company waived its right to terminate him having known about much of his conduct for some time before the attempted termination, and that ILM was unjustly enriched by their

---

[1] Despite Johnson's claim of complaints, no emails or phone calls relating to clients' alleged negative perceptions were produced in discovery, nor was there any proffer with respect to this corroborating evidence at the hearing.

continued use of campaign materials following Bernsen's termination.  (ECF No. 24 at 21,29).

B.  **SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56 requires the Court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.'  A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the Court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact.  Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-25.  When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial.

8

_Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 586-87 (1986).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." _Reeves v. Sanderson Plumbing Prods., Inc._, 530 U.S. 133, 150 (2000); _See Anderson_, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." _Anderson_, 477 U.S. at 249.

**C.     RECOMMENDED CONCLUSIONS OF LAW**

**1.     ILM has not waived its rights under the contract.**

Bernsen argues that ILM has waived its right to terminate the Agreement for violations of the morality clause as the company knew about his conduct for some time prior to terminating him.  (ECF No. 24 at 21).  This argument ignores the contract's unambiguous anti-waiver provision.  An anti-waiver provision allows a contracting party to forego application of a term of the agreement but to assert the term, and demand compliance with it, in the future.  _Virginia Elec. & Power Co. v. Norfolk S. Ry. Co._, 278 Va. 444, 683 S.E.2d 517 (2009).  In _Virginia Elec. & Power Co. v. Norfolk S. Ry. Co._, the contract

9

provision stated that "failure of either Party to demand strict performance of any or all of the terms of this Agreement ... shall not be construed as a waiver or relinquishment of that Party's right to assert or rely upon any such right in the future." The court held that this language did not preclude the defendant from enforcing the terms of the agreement even though it had not done so previously.

Similarly, in this case the Agreement contains an anti-waiver provision, stating: "No waiver by Network of the nonperformance or breach of any term, condition, or obligation to be performed by or binding upon Talent shall be a waiver of any subsequent nonperformance or breach of the same or any other term, condition, or obligation." (ECF No. 19-3 at 7). Therefore, simply because ILM knew of Bernsen's conduct prior to his termination does not give rise to a waiver of its rights under the terms of the Agreement.

## 2.    The Agreement contains a morality clause.

Bernsen also argues that the Agreement does not contain a morality clause, but rather an "unambiguous indemnification provision that applies [only] if a claim is made against ILM based on Bernsen's conduct." (ECF No. 31 at 1). Bernsen relies mainly on the heading "Indemnification" that precedes the morality clause language. At the hearing, counsel for Bernsen

stated that the morality clause was intended to limit ILM's indemnification obligation. He argued that there is no other explanation for the seemingly odd placement of the word "Indemnification," and the related language in the provision concerning ILM's purchase of insurance.

While the undersigned agrees the placement is odd, there is no dispute that Section VI, which states in part, "Talent agrees to not commit any act or do anything which may tend to bring Talent into public disrepute, contempt, scandal or ridicule or which might tend to reflect unfavorably on the Network, their clients or on the Talent," placed Bernsen on notice of his obligations.

The language by itself, which is similar to the language in many morality clauses, clearly imposes an obligation on Bernsen to refrain from conduct tending to bring him into public disrepute. See Galaviz v. Post-Newsweek Stations, 380 F. App'x 457, 460 (5th Cir. 2010); Nader v. ABC Television, Inc., 330 F. Supp. 2d 345, 346 (S.D.N.Y. 2004) aff'd, 150 F. App'x 54 (2d Cir. 2005); Calton v. CV Radio Associates, L.P., 639 N.E.2d 1249, 1251 (Ohio Ct. App. 1994).

Bernsen contends that the meaning of the morality language in light of its juxtaposition with indemnity provisions creates an ambiguity requiring the Court to examine extrinsic evidence.

11

Because he has offered a reasonable alternative interpretation that accounts for the "Indemnification" title, Bernsen claims the Court must consider other evidence of the parties' intent. However, he has offered no other evidence beyond the allegations contained in the pleadings and briefs.

If an agreement is unambiguous, parol evidence is inadmissible to vary the terms. But when the meaning is unclear, the Court may examine extrinsic evidence to clarify its terms. U.S. ex rel. W. Chester Elec. & Electronics Co., Inc. v. Sentry Ins., 774 F.2d 80, 84 (4th Cir. 1985). In this case the disputed sentence constituting the morality clause is not ambiguous. While the placement in the Indemnification section contributes to the parties' confusion over the appropriate remedy, the extrinsic evidence proffered by Bernsen is of little help in resolving the confusion and creates no material issue for trial.

Bernsen's interpretation rests on the declaration of his agent, Randall James ("James") who initially reviewed the Agreement for Bernsen. (ECF No. 24-2 at 3). The declaration states that James understood the clause to be an indemnification provision, but also states "I had no specific discussions about § VI of the Agreement during my conversations regarding the Agreement with Mr. Dinzler or with any ILM employee." Id.

12

The alleged dispute, therefore, does not arise from any conversation or assertion made by ILM, or any other evidence. Rather it results from James' own "understanding" of the provision's meaning based entirely on his reading of the undisputed language. Without further evidence that the provision was in dispute, or even discussed, prior to execution of the Agreement, James' interpretation of the plain language has little relevance. Because the language itself is not ambiguous and puts Bernsen on notice of his obligations, the undersigned finds that there is no need to resort to extrinsic evidence and no genuine dispute of material fact on this issue. Section VI of the Agreement contains a morality clause.

**3.    Bernsen's alleged breach of the morality clause must be a material breach to warrant termination.**

Though the obligation of the morality clause is unambiguous, the remedy for any breach of that obligation is less clear. The provision, falling as it does under the Indemnification section, is not self-executing. Unlike all of the other morality clauses ILM cites, termination is not specified as the remedy for any breach of the morality clause. See e.g. Galaviz v. Post-Newsweek Stations, 380 F. App'x at 460. ILM argues that because the general termination language of the Agreement permits termination "upon the occurrence of a Default

13

or breach," that Bernsen's conduct need not constitute a material breach as long it, in some way, violates the terms of the agreement. The undersigned disagrees.

Virginia law has long required that to permit cancellation of a contract, a breach must be material. In RW Power Partners, L.P. v. Virginia Elec. & Power Co., this Court, applying Virginia law, explained:

> Where the breach is not material and the contract does not explicitly state that an immaterial breach will excuse further performance, termination of the contract is improper, and the injured party is limited to damages for the breach. The Supreme Court of Virginia in Home Creek Smokeless Coal Co. v. Combs, 132 S.E.2d 399, 406 (Va. September 11, 1963), has underscored the principle that, unless there is a provision in a contract clearly and expressly allowing forfeiture, the breach of a covenant does not justify cancellation of the entire contract.
>
> Of course, where the contract language makes it clear that the parties have agreed that any breach, material or not, permits cancellation, the courts must give effect to that agreement. Such an agreement, however, may not be lightly inferred nor may the courts, by interpretation, supply that which has not been made explicit.

RW Power Partners, L.P. v. Virginia Elec. & Power Co., 899 F. Supp. 1490, 1502 (E.D. Va. 1995).

Similar to the general termination language in this case, in RW Power, the contract provided if RW Power "fails to perform any of its obligations pursuant to this Agreement, then Virginia Power may cancel this Agreement." Id. However, because the

14

contract did not clearly state that any breach, either material or otherwise, would permit cancellation, it did not abrogate the common-law materiality requirement. <u>Id.</u>  The Court held that:

> If, as must be done, the contract is construed as a whole so as to give effect to all of its provisions and in a way that avoids unreasonable results, <u>Management Sys. Assocs. v. McDonnell Douglas Corp.</u>, 762 F.2d 1161, 1172 (4th Cir.1985); <u>Dart Drug v. Nicholakos</u>, 221 Va. 989, 993-94, 277 S.E.2d 155, 157-58 (1981), Article XI cannot be construed to permit cancellation for a non-material breach of any obligation.
>
> In sum, the language of Article XI does not abrogate the common law principle of materiality because it does not state clearly that cancellation may be based on any breach, material or otherwise. Yet, that is what must be done if a contract is to abrogate a principle which is so fundamentally embedded in the common law. Otherwise, the courts are called upon to effect abrogation by interpretation.

<u>Id.</u>  See also <u>S. Auburn L.P. v. Old Auburn Mills, L.P.</u>, 24210, 2005 WL 1995433 (Va. Cir. Ct. Aug. 18, 2005); <u>Country Club Associates Ltd. P'ship v. F.D.I.C.</u>, 918 F. Supp. 429, 435 (D.D.C. 1996).

In order to terminate Bernsen for a non-material breach, as ILM argues it was permitted to do, the Agreement must specifically state the intent to abrogate this common law principle.  In fact, in the cases cited by ILM, each morality clause is followed by an express provision which indicates the Talent may be terminated for a failure to adhere to the morality

clause.  See Galaviz v. Post-Newsweek Stations, 380 F. App'x at 460; Nader v. ABC Television, Inc., 330 F. Supp. 2d at 346; Calton v. CV Radio Associates, L.P., 639 N.E.2d at 1251.  By contrast, in this case, the morality clause is truncated (and awkwardly situated) such that no express remedy for breach is readily apparent.  The Agreement does not, therefore, abrogate Virginia's common law rule, and Bernsen's alleged breach must be material to permit his termination.  If the breach is non-material, ILM is limited to damages from the breach.  See U.S. ex rel. Virginia Beach Mech. Services, Inc. v. SAMCO Const. Co., 39 F. Supp. 2d 661, 670 (E.D. Va. 1999)("A minor breach may allow the aggrieved party to recover damages or a set-off against the breaching party, but it does not excuse that aggrieved party from performing.  A material breach, on the other hand, does entirely discharge the aggrieved party's obligation to perform.")(citations omitted); RW Power Partners, L.P. v. Virginia Elec. & Power Co., 899 F. Supp. at 1502.

Given the placement of the morality clause, adjacent to provision related to insurance or indemnity, and considering the contract as a whole, the undersigned concludes that any breach by Bernsen of the morality clause must be material to justify his termination.  A non-material breach would give rise to a claim for damages only.

16

4.   **A genuine dispute of material fact exists as to whether Bernsen's actions constitute a material breach of the Agreement permitting termination.**

The summary judgment record presents a genuine dispute of material fact as to whether Bernsen breached the morality clause in the Agreement and whether that breach was material.   ILM argues that because there is no dispute that these incidents occurred, the question of whether they amount to a breach is a matter of law for the Court.   (ECF No. 19 at 10-11).   ILM cites three cases for this proposition, all of which involved particularly egregious behavior in violation of a morality clause which expressly included a termination right.   <u>Id.</u> (citing <u>Galaviz v. Post-Newsweek Stations</u>, 380 F. App'x at 460 (television news reporter was fired after domestic dispute that resulted in her arrest and significant publicity — the third such incident); <u>Nader v. ABC Television, Inc.</u>, 330 F. Supp. 2d at 346 (actor was arrested and charged with selling cocaine after a previous DUI conviction); <u>Calton v. CV Radio Associates, L.P.</u>, 639 N.E.2d at 1251 (radio talk-show host made an on-air ethnic slur)).

These cases present clear violations of the talent's morality clause as a matter of law, both because of the severity of the conduct and because the morality clause at issue in each case specifically triggered a termination right.   In Bernsen's

17

case, however, there are disputes as to his actual conduct, the effect it likely had on the public's perception of him, and the appropriate remedy – termination or damages.

In Mendenhall v. Hanesbrands, Inc., the Court held that a there was a genuine dispute of material fact as to whether the talent's conduct constituted a breach of his morality clause. No. 1:11cv570, 2012 WL 1230743 (M.D.N.C. April 12, 2012).[2] In Mendenhall, Plaintiff, a professional football player, expressed controversial opinions on Islam, women, parenting, and relationships, through his Twitter account.   Id.   Defendant claimed that the comments violated Plaintiff's morality clause. In denying Defendant's motion, the Court held that

> [A] dispute of fact exists between the parties as to
> the nature of the public's response to Plaintiff's May
> 2, 2011 tweets….   To resolve this matter, a factual
> determination as to the nature of the public's
> response is necessary in order to assess whether the
> public's response to Plaintiff's May 2, 2011 tweets
> could reasonably be characterized in a manner that
> would trigger Hanesbrands' right to terminate the
> Agreement under Section 17(a)'s standard, which
> applied only to acts that tended to "bring [Mr.
> Mendenhall] into public disrepute, contempt, scandal,
> or ridicule," or tended "to shock, insult, or offend
> the majority of the consuming public." When, as in
> this case, there exists a material dispute of fact,
> such a determination goes beyond the scope of a motion
> for judgment on the pleadings, and therefore judgment

---

[2] Although Mendenhall was decided on a Motion for Judgment on the Pleadings, the allegedly offensive Twitter postings were specifically recited in the pleadings and their content was undisputed. Mendenhall, 2012 WL 1230743 at *2-3.

> as a matter of law is not appropriate at this stage of
> the proceedings.

Id. (citing Smith v. McDonald, 562 F.Supp. 829, 842
(M.D.N.C.1983), aff'd, 737 F.2d 427 (4th Cir.1984), aff'd, 472
U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985); Med-Trans Corp.
v. Benton, 581 F.Supp.2d 721, 728 (E.D.N.C.2008).

Even in the aggregate, the five events cited by ILM, some
of which themselves are in dispute, could be viewed by a
reasonable fact-finder as a non-material breach, or even no
breach at all. For example, the offensive skit was taped prior
to Bernsen signing the Agreement, and thus Bernsen did not
"commit any act or do anything" after the Agreement was in force
with regard to the skit. Moreover, while the skit is repulsive,
it is plainly satire intended to be humorous. It is less than
fifty seconds long, and – for reasons immediately evident after
the fifteenth second – it was not widely viewed.

The two tax lien articles involved an apparent oversight,
corrected as of the date of the motion. In fact, the exhibit
documenting the internet story included extensive feedback in
which readers appeared to side with Bernsen, against the overly
critical tabloid nature of the reporting. (ECF No. 19-5).
Several other acclaimed celebrities were also mentioned in the
story as having similar liens.

The Ghost Stories segment did not glorify drug use or promiscuity, in fact, it depicted Bernsen's wild lifestyle in the 1960's and '70s as being far behind him after a paranormal reprimand from his deceased aunt. (ECF No. 19-11).

With respect to the fight at the bar in Ohio, Bernsen claims that he was defending a female crew member. In fact, the story was actually reported to reflect this version of events, though the headlines were written using more inflammatory language. (ECF Nos. 18-8;18-9;18-10). Bernsen denies that he ever said anything about shooting anyone as the stories report. (ECF No. 31-1 at 10). Instead, Bernsen claims to have said "You're lucky somebody here doesn't have a gun, you'd be dead," suggesting that guns would have produced much more tragic consequences given the volatility of the situation. Id.

Finally, Bernsen claims that his outburst at the Cap Cana conference was motivated by an actual and severe lack of organization which caused multiple problems for him and his family throughout his stay. (ECF No. 31-3 at 14-17). He also asserts that the incident was barely public, overheard by only a few people, none of whom have claimed the matter affected his ability to serve as spokesperson for BIG CASE. Id.

With respect to each of these incidents, and all of them collectively, ILM has produced no evidence that ILM or any ILM

client was actually affected by Bernsen's conduct. Bernsen has produced extensive deposition testimony suggesting ILM clients either did not know of the matters or considered them irrelevant to their marketing decisions. See (ECF Nos. 31-5 at 7; 31-7 at 7; 31-9 at 7-8; 31-10 at 8). This is not to say that Bernsen did not breach his morality obligations, or that his breach was not material, only that a reasonable fact-finder could conclude that his conduct after executing the Agreement did not "tend to bring [him] into public disrepute… or reflect unfavorably on the Network."[3] (ECF No. 19-3 at 4). Therefore, the undersigned finds that this matter is not question of law, but a determination of fact which must be left to the jury. See Mendenhall, 2012 WL 1230743.

**5. Bernsen has failed to state a separate claim of unjust enrichment.**

Bernsen contends that because ILM continued to use campaign materials from BIG CASE following his termination, it has been unjustly enriched. Unjust enrichment is an implied or quasi-contract based on the simple principle that "one person may not enrich himself unjustly at the expense of another." Rinehart v. Pirkey, 126 Va. 346, 351, 101 S.E. 353, 354 (1919); see also

---

[3] ILM produced scant evidence that any person associated any of Bernsen's alleged behavior with ILM or ILM's clients. This is a critical distinction between this case, and those cited by ILM where the talent's link to his/her employer was widely known. See Calton, 639 N.E.2d at 1251 (radio host's ethnic slur occurred on-air while employed).

Kern v. Freed Co., Inc., 224 Va. 678, 680, 299 S.E.2d 363, 365 (1983).

It is a well-established principle of contract law that "an express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature containing the same subject matter. The rights of the parties are to be determined by the provisions of the express contract, and the law will not imply an agreement in contravention thereof." S. Biscuit Co. v. Lloyd, 174 Va. 299, 311, 6 S.E.2d 601, 606 (1940) (citing Grice v. Todd, 120 Va. 481, 91 S.E. 609, L.R.A. 1917D, 512; Ellis and Meyers Lumber Co. v. Hubbard, 123 Va. 481, 96 S.E. 754; County of Campbell v. Howard, 133 Va. 19, 112 S.E. 876).

In this case, the Agreement specifically addresses post-termination obligations and states that if the Network terminates the agreement, it "shall be released and discharged from any liability or obligation whatsoever to Talent hereunder...." and "...neither Network's ownership of the Picture nor any grant of rights to Network hereunder shall be affected, limited or terminated in any way by any termination or cancellation of this Agreement for any reason." (ECF No. 19-3 at 6). The "Picture" is not defined in the Agreement, however the "grant of rights to the Network [ILM]" is extensive and

22

encompasses the rights to all the material, including Bernsen's likeness, for the purposes specified even after the Agreement is terminated. Thus, the contractual provisions address post-termination use of the materials, and do not require ILM to forfeit any right it may have to the materials that have already been produced. This express language of the Agreement on post-termination obligations "precludes the existence of an implied contract" for unjust enrichment in this case. See S. Biscuit Co. v. Lloyd, 174 Va. at 311.

Furthermore, Bernsen's rights are governed exclusively by the terms of the Agreement, which states that "[n]o breach of Network's obligations or its clients, licensees or assignees under this Agreement shall entitle Talent to equitable remedies. Talent agrees that Talent's rights are limited to the right, if any, to obtain damages in action at law." Therefore, for any alleged violation, Bernsen's remedy would fall under the terms of the Agreement, not under a claim for unjust enrichment.

D.     **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the Court DENY the ILM's Motion for Summary Judgment in part and GRANT it part, finding as a matter of law that ILM has not waived its rights under the Agreement, and that the language of the Agreement includes a morality clause. However, because

23

material facts remain in dispute concerning Bernsen's conduct, the undersigned recommends the Court DENY ILM's Motion as to Bernsen's alleged breach of the morality clause. Finally, the undersigned recommends that the Court GRANT ILM's Motion on Bernsen's claim for unjust enrichment and dismiss that claim.

E.   **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations.

Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

                                        /s/
                              Douglas E. Miller
                              United States Magistrate Judge
                              _____

                              DOUGLAS E. MILLER
                              UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

June  20 , 2012

## Clerk's Mailing Certificate

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

James Douglas Baldridge
Venable LLP
575 7th St NW
Washington, DC 20004

Danielle R Foley
Venable LLP
575 7th St NW
Washington, DC 20004

Richard Hooper Ottinger, Esq.
Vandeventer Black, LLP
500 World Trade Center
Norfolk, VA  23510

Dustin Mitchell Paul
Vandeventer Black LLP
101 West Main St
Suite 500
Norfolk, VA 23510


Fernando Galindo, Clerk


By   _____

Deputy Clerk
_____, 2012